1  Michael P. Lehmann (Cal. Bar No. 77152)
   Bonny E. Sweeney (Cal. Bar No. 176174)
2  Christopher L. Lebsock (Cal. Bar No. 184546)
   HAUSFELD LLP
3  600 Montgomery Street, Suite 3200
   San Francisco, CA 94111
4  Tel:  (415) 633-1908
   Fax:  (415) 358-4980
5  Email:  mlehmann@hausfeld.com
   Email:  bsweeney@hausfeld.com
6  Email:  clebsock@hausfeld.com

7  Michael D. Hausfeld
   James J. Pizzirusso
8  HAUSFELD LLP
   1700 K Street NW, Suite 650
9  Washington, DC 20006
   Telephone: (202) 540-7200
10 Facsimile: (202) 540-7201
   Email:  mhausfeld@hausfeld.com
11 Email:  jpizzirusso@hausfeld.com

12 *Counsel for Plaintiff and the Class*

13

14                **UNITED STATES DISTRICT COURT**

15                **SOUTHERN DISTRICT OF CALIFORNIA**

16

17 | OLEAN WHOLESALE GROCERY | Case No. **'15CV1714 W    MDD** |
   | COOPERATIVE, INC., on behalf of itself and all others similarly situated, | |
   | Plaintiff | **CLASS ACTION COMPLAINT** |
   | v. | JURY TRIAL DEMANDED |
   | BUMBLE BEE FOODS LLC, TRI-UNION SEAFOODS LLC, and STARKIST COMPANY, | |
   | Defendants. | |

26       Plaintiff Olean Wholesale Grocery Cooperative, Inc., by and through its

27 undersigned attorneys, complains and alleges as follows. All allegations herein

28 other than those relating directly to Plaintiff are based on information and belief.

CLASS ACTION COMPLAINT                    -1-

## NATURE OF THE ACTION

1. This action arises out of a conspiracy by the three largest producers of packaged seafood products ("PSPs") in the United States, its territories and the District of Columbia—Bumble Bee Foods LLC, Tri-Union Seafoods LLC, and StarKist Company (collectively, "Defendants")—which began no later than July 24, 2011, and continues to the present (the "Class Period"), to fix, raise, maintain, and/or stabilize prices for PSPs within the United States, its territories and the District of Columbia in violation of Sections 1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 3). As used herein, the term "PSPs" refers to shelf-stable seafood products (predominantly tuna) that are sold in cans, pouches or ready-to-eat serving packages.

## JURISDICTION AND VENUE

2. This complaint is filed under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, equitable relief, costs of suit, and reasonable attorneys' fees for violation of Section 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3. The Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

3. Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c), and (d) because Defendants reside, transact business, are found within, and/or have agents within this District, and a substantial part of the events giving rise to Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

4. This Court has personal jurisdiction over Defendants because, *inter alia,* each: (a) transacted business in this District; (b) directly or indirectly sold and delivered PSPs in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy and agreement to

CLASS ACTION COMPLAINT -2-

limit capacity that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

# PLAINTIFF

5. Plaintiff Olean Wholesale Grocery Cooperative, Inc. is a current resident of the State of New York. During the Class Period, Plaintiff directly purchased PSPs from one of more of the Defendants and has suffered pecuniary injury as a result of the antitrust violation alleged herein.

# DEFENDANTS

6. Defendant Bumble Bee Foods LLC ("Bumble Bee") is a domestic corporation with its principal place of business located at 280 10th Avenue, San Diego CA 92101. Bumble Bee produces and sells PSPs throughout the United States (including this District), its territories and the District of Columbia. Bumble Bee is privately owned by Lion Capital ("Lion"), based in the United Kingdom.

7. Defendant Tri-Union Seafoods LLC is a domestic corporation with its principal place of business located at 9330 Scranton Road, Suite 500, San Diego CA 92121. Tri-Union Seafoods LLC produces and sells PSPs throughout the United States (including this District), its territories and the District of Columbia, and markets these products under the brand name Chicken of the Sea. Unless otherwise indicated, Tri-Union Foods LLC will be referred to herein as "CoS". CoS is owned by Thai Union Frozen Products ("TUF"), a company based in Thailand.

8. Defendant StarKist Company ("StarKist") is a domestic corporation with its headquarters at 225 North Shore Drive, Suite 400, Pittsburgh PA 15212. StarKist produces and sells PSPs throughout the United States (including this District), its territories and the District of Columbia. StarKist is privately owned by Dongwon Enterprise ("Dongwon"), based in South Korea.

# UNNAMED CO-CONSPIRATORS

9. On information and belief, at all relevant times, other producers of PSPs willingly conspired with Defendants in their unlawful restraint of trade. All

averments herein against Defendants are also averred against these unnamed co-conspirators.

## AGENTS

10. The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

## INTERSTATE TRADE AND COMMERCE

11. Throughout the Class Period, there was a continuous and uninterrupted flow of invoices for payment, payments, and other documents essential to the sale of packaged seafood products in interstate commerce between and among offices of Defendants and their customers located throughout the United States, its territories and the District of Columbia.

12. Throughout the Class Period, Defendants transported substantial amounts of PSPs in a continuous and uninterrupted flow of interstate commerce throughout the United States, its territories and the District of Columbia.

13. Throughout the Class Period, Defendants' unlawful activities, as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial and reasonably foreseeable effect upon commerce in the United States, its territories and the District of Columbia.

## FACTUAL ALLEGATIONS

14. PSPs are sold to club warehouses, retail groceries, grocery cooperatives, mass merchandisers, and drug stores, among others. According to a May 2012 presentation by Bumble Bee, total United States retail sales of shelf-stable seafood products were $2.346 billion in 2011 and were estimated to be $2.397 billion in 2012. In one report, Bumble Bee estimated that canned tuna represents 73% of this value. In the same report, Bumble Bee estimated that total United States retail sales of shelf-stable tuna were $1.719 billion in 2011 and were estimated to be $1.750 billion in 2012.

CLASS ACTION COMPLAINT                -4-

15. Defendants are the three largest domestic manufacturers of PSPs. The industry is highly concentrated. According to the aforementioned presentation by Bumble Bee, it had 29% of the domestic shelf-stable seafood market in 2011, CoS had 18.4% and StarKist had 25.3%. The remaining market share was comprised of smaller companies and private label brands. With respect to shelf-stable tuna, StarKist had 34.6% of the market, Bumble Bee had 27.8% and CoS had 19.4%. In December of 2014, the *Wall Street Journal* reported that the Defendants' respective shares of the domestic market for canned tuna were 13% for CoS, 25% for Bumble Bee, and 36% for StarKist. Bualuang Securities reported the shares for the domestic canned tuna market slightly differently, with StarKist at 30%, Bumble Bee at 28% and CoS at 20%.

16. This oligopolistic structure within the industry is the result of recent mergers and acquisitions. For example, in 1997, Van Camp Seafood Company ("Van Camp") was acquired by the investment group Tri-Union Seafoods LLC, of which TUF was a member. Thereafter, TUF bought out the other investors to acquire Van Camp completely, which it renamed Chicken of the Sea International, an entity that was later merged into Tri-Union Seafoods LLC. In 2008, Dongwon acquired StarKist from Del Monte Foods for $363 million. Similarly, in 2014, TUF bought King Oscar, a Norwegian sardine canner that sold 37% of its products in the United States. And in December of 2014, TUF announced the acquisition from Lion (subject to regulatory approval) of Bumble Bee for $1.51 billion. The combination of CoS and Bumble Bee would have created a virtual duopoly, with the combined entity substantially exceeding the market share of StarKist. TUF had planned to finance the acquisition partly through a preferential public offering to existing shareholders that would have raised approximately $380 million.

17. On July 23, 2015, TUF suspended the preferential public offering in light of a grand jury investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ"). TUF disclosed on that day that both

CLASS ACTION COMPLAINT                -5-

Bumble Bee and CoS had received grand jury subpoenas relating to an antitrust investigation of PSPs. The publication *Undercurrent News* further reported in an article dated that same day that "Thai Union held a conference with analysts on the suspension of the share offer, in which the company's management said other US seafood producers have also received a subpoena requiring the production of relevant information to the DOJ." The publication *Global Competition Review* similarly reported as follows:

> In a letter to the Bangkok stock exchange on Wednesday, Thai Union chairman Kraisorn Chansiri confirmed that the US Department of Justice is investigating his company's sector, causing Thai Union to suspend a stock issuance that had been intended to finance the $1.5 billion acquisition of Bumble Bee.
>
> He said the Thai Union subsidiary Tri-Union Seafoods, which operates in the US under the Chicken of the Sea brand, had received a subpoena "requiring Tri-Union to provide relevant information to the DoJ in relation to an antitrust investigation of the packaged seafood industry in the United States."

18. The article goes on to state:

> An industry expert said the subpoena does not appear to be limited to the merger review, and early information indicates the demand for information came from a separate section of the antitrust division, not one tasked with analysing deals.
>
> It is highly likely that something produced in the merger investigation sparked this investigation touching the industry as a whole rather than just the parties to the deal, he said.
>
> ****
>
> The source said others in the industry are now anticipating that they too will be subpoenaed….

19. Based on these statements, it appears that StarKist received a subpoena as well and that the DOJ's investigation extends to the entire domestic PSP sector.

20. The fact that these companies received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's *Antitrust Division Manual*, available at

CLASS ACTION COMPLAINT                    -6-

http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf. Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id.* at III-82. The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division." *Id.* "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id.* at III-83. "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id.*

21. There are economic indications that support the conclusion that there was collusive pricing within the domestic PSP industry.

22. Consumption of PSPs, particularly canned tuna, has declined over the last ten years in the United States. The annual consumption per person was 3.1 lbs. in 2005, but had fallen to 2.3 lbs. in 2013. An article in the *Washington Post* graphically represented this decline by measuring United States annual *per capita* consumption from 1930 to 2010:



The same article presented this graph, showing that while Americans are buying

CLASS ACTION COMPLAINT                -7-

less canned seafood, they are paying more for what they do buy:



23. Given this decline in consumption of the signature PSP, one would expect rational businesses to reduce the prices for PSPs, but that did not happen. The following chart, taken from data available at the Bureau of Labor Statistics, depicts seasonally adjusted U.S. city average prices for shelf stable fish and seafood from January 2005 through the first part of 2015, with the period 1982-84 used as a baseline.



24. Raw material costs do not adequately explain these price increases. While the cost per metric ton of skipjack tuna rose in 2012 and early 2013, it declined precipitously thereafter. According to the April 19, 2015 issue of *Tuna Market Intelligence*, "[a]s recently as June last year, skipjack was selling at US$1,800 in Bangkok. But the price has since plummeted to US$1,000 since the beginning of the year, with industry officials anticipating further reductions in price this year." Tuna exporters in Ecuador noted in January of 2015 that the price per metric ton had declined from $1400 to $800. And the United Nations Food & Agriculture Organization noted in its May 2015 "Food Outlook" biannual report noted that tuna prices had dropped considerably in 2014: "tuna prices declined significantly due to excess supply, with frozen skipjack prices hitting a 6-year low." Despite these drastically declining raw material costs, Defendants did not decrease prices and try to obtain more market share.

25. TUF's Annual Reports discuss this situation. In its 2013 Annual Report, TUF stated that "our branded tuna business showed resilient growth from 2012 thanks to the price adjustments in Europe and *more rational market competition in the US*." (Emphases added). It said in the same report that its future profit margins would depend upon *"[r]easonable US canned tuna competition without unnecessary price*." (Emphases added). In its 2014 Annual Report, TUF explicitly noted that this goal had been achieved. It stated:

> *Thanks to reduced price competition (absence of cut throat pricing)* and generally lower fish cost, *our own tuna brands marked a great year of increased profitability*. Despite minimal sales growth in the US, competitive inventory cost and reasonable market conditions helped lift the margin of our US brand. (Emphases added).

The same report went on to note that "*sensible market competition*, supported by lower raw material costs, made it possible for our own tuna brands to expand their margins through the year despite limited volume growth." (Emphases added). It indicated that future revenue growth would again be dependent upon *"[r]easonable*

CLASS ACTION COMPLAINT                -9-

*US canned tuna market competition that focuses more on consumption creation than market share alone.*" (Emphases added). The "reasonable market conditions", "more rational market competition", "sensible market competition", avoidance of battles for market share and "absence of cut throat pricing" that the reports note could only have come about through collusion. It would have been against the individual self-interest of each Defendant to eschew increasing market share during this period by lowering prices.

26. There were numerous business opportunities for Defendants to meet and engage in such collusion. One such opportunity is provided by the Tuna Council. As explained on that organization's website:

> The National Fisheries Institute's Tuna Council represents the largest processors and household names for canned and pouch tuna in the U.S. including *Bumble Bee®, Chicken of the Sea® and StarKist®*. The Tuna Council speaks for the tuna industry on numerous issues including food safety, labeling, sustainability, nutrition education and product marketing.

27. An example of such joint conduct is provided by the "Tuna the Wonderfish" advertising campaign of 2011-12. This campaign was bankrolled by the Defendants and carried out under the auspices of the Tuna Council with the support of Thai processors. In it, the Defendants teamed up for marketing purposes. Joe Tuza, Senior Vice-President of Marketing for StarKist, reportedly said that "[w]e worked together surprisingly well." He said further that the campaign, intended to increase consumption of tuna, was based on the hope that "as the water level rises…all boats rise with the tide", referring to the three Defendant companies. The same philosophy appears to undergird the alleged price-fixing conspiracy.

28. Another opportunity to collude was provided through bilateral copacking agreements between Bumble Bee and CoS. Bumble Bee copacks for CoS at the former's plant located in Santa Fe Springs, California with respect to West Coast sales. CoS does the same for Bumble Bee at the former's plant in

Georgia with respect to East Coast sales. Thus, even before the proposed merger, these two companies were cooperating closely. These interlocking relationships provided an excellent opportunity to collude on pricing.

## CLASS ACTION ALLEGATIONS

29. Plaintiff brings this action on its own behalf and as a class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class (the "Class"):

> All persons and entities that directly purchased packaged seafood products within the United States, its territories and the District of Columbia from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time between July 24, 2011 and the present. Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and immediate families.

30. Plaintiff does not know the exact number of members of the Class because such information is in the exclusive control of Defendants. Due to the nature of the trade and commerce involved, however, Plaintiff believes that Class members number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States, its territories and the District of Columbia so that joinder of all Class members is impracticable.

31. There are questions of law and fact which are common to the claims of Plaintiff and the Class, including, but not limited to:

   a. Whether Defendants engaged in a combination or conspiracy with their co-conspirators to fix, raise, maintain, and/or stabilize the prices for PSPs;

   b. Whether the purpose and/or effect of the acts and omissions alleged herein was to restrain trade, or to affect, fix, control, and/or maintain the prices for PSPs;

   c. The existence and duration of the horizontal agreements alleged herein to fix, raise, maintain, and/or stabilize the prices for PSPs;

d.  Whether Defendants violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

e.  Whether Defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers, employees, or representatives were acting within the scope of their authority and in furtherance of Defendants' business interests;

f.  Whether, and to what extent, the conduct of Defendants caused injury to Plaintiff and members of the Class, and, if so, the appropriate measure of damages; and

g.  Whether Plaintiff and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of Sections 1 and 3 of the Sherman Act.

32.  Plaintiff's claims are typical of the claims of the members of the Class.

33.  Plaintiff will fairly and adequately assert and protect the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class.

34.  Plaintiff is represented by counsel competent and experience in the prosecution of antitrust and class action litigation.

35.  The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

36.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

a.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

b.  The Class is readily definable and one for which records should exist in the files of Defendants.

c. Prosecution as a class action will eliminate the possibility of repetitious litigation.

d. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

e. Class treatment will permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint on an individual basis.

37. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## COUNT I

**Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)**

38. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

39. Defendants and their co-conspirators engaged in a continuing contract, combination, and conspiracy to artificially fix, raise, maintain, and/or stabilize the prices of PSPs within the United States, its territories, and the District of Columbia in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

40. Defendants and their co-conspirators agreed to, and did in fact, restrain trade or commerce by fixing, raising, maintaining, and/or stabilizing at artificial and non-competitive levels, the prices of such PSPs.

41. In formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize the price of PSPs.

42. The illegal combination and conspiracy alleged herein had the following effects, among others:

      a.      The prices charged by Defendants to, and paid by, Plaintiff and members of the Class for PSPs were fixed, raised, maintained and/or stabilized at artificially high and non-competitive levels;

      b.      Plaintiff and members of the Class have been deprived of free and open competition in the purchase of PSPs;

      c.      Plaintiff and members of the Class have been required to pay more for PSPs than they would have paid in a competitive marketplace absent Defendants' price-fixing conspiracy;

      d.      Competition in the sale of PSPs has been restrained, suppressed or eliminated.

43. As a direct and proximate result of Defendants' conduct, Plaintiff and members of the Class have been injured and damaged in their business and property in an amount to be determined according to proof.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays:

A. That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be give to members of the Class;

B. That the Court adjudge and decree that the contract, combination and conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

C. That the Court enter judgment against Defendants, jointly and severally, in favor of Plaintiff and the Class;

D. That the Court award Plaintiff and the Class treble damages;

E. That the Court award Plaintiff and the Class attorneys' fees and costs as well as pre-judgment and post-judgment interest as permitted by law;

F. That Defendants and their co-conspirators, their respective successors,

assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or their co-conspirators, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combination, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or affect in restraining competition; and

     G.    That the Court award Plaintiff and the Class such other and further relief as may be deemed necessary and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial on all matters so triable.

Dated:     August 3, 2015     Respectfully submitted,

By: */s/ Bonny E. Sweeney*
Michael P. Lehmann (Cal. Bar No. 77152)
Bonny E. Sweeney (Cal. Bar No. 176174)
Christopher L. Lebsock (Cal. Bar No. 184546)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel:  (415) 633-1908
Fax:  (415) 358-4980
Email:  mlehmann@hausfeld.com
Email:  bsweeney@hausfeld.com
Email:  clebsock@hausfeld.com

Michael D. Hausfeld
James J. Pizzirusso
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email:  mhausfeld@hausfeld.com
Email:  jpizzirusso@hausfeld.com

Arthur N. Bailey, Sr.
ARTHUR N. BAILEY & ASSOCIATES
111 West Second Street, Suite 4500
Jamestown, NY 14701
Telephone: (716) 664-2967
Facsimile: (716) 664-2983

CLASS ACTION COMPLAINT     -15-

Email: artlaw@windstream.net

*Counsel for Plaintiff Olean Wholesale Grocery Cooperative, Inc. and the Class*

CLASS ACTION COMPLAINT         -16-