Michael P. Lehmann (Cal. Bar No. 77152)
Bonny E. Sweeney (Cal. Bar No. 176174)
Christopher L. Lebsock (Cal. Bar No. 184546)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel:  (415) 633-1908
Fax:  (415) 358-4980
Email:  mlehmann@hausfeld.com
Email:  bsweeney@hausfeld.com
Email:  clebsock@hausfeld.com

Michael D. Hausfeld
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email:  mhausfeld@hausfeld.com

*Interim Lead Counsel for Plaintiffs and the Direct Purchaser Class*
[Additional Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OLEAN WHOLESALE GROCERY COOPERATIVE, INC., on behalf of itself and all others similarly situated,<br><br>          Plaintiff<br><br>          v.<br><br>BUMBLE BEE FOODS LLC, TRI-UNION SEAFOODS LLC, STARKIST COMPANY, and TRI MARINE INTERNATIONAL, INC.,<br><br>          Defendants. | Case No. 15-cv-01714-JLS-MDD<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Olean Wholesale Grocery Cooperative, Inc., by and through its undersigned attorneys, complain and allege as follows. All allegations herein other than those relating directly to Plaintiff are based on information and belief.

## NATURE OF THE ACTION

1.    This action arises out of a conspiracy by the three largest brand name producers of packaged seafood products ("PSPs") in the United States, its territories and the District of Columbia (Bumble Bee Foods LLC, Tri-Union Seafoods LLC, and StarKist Company) as well as a white label, common supplier to all three (Tri Marine International, Inc.) which began no later than January 1, 2008, and continues to the present (the "Class Period"), to fix, raise, maintain, and/or stabilize prices for PSPs within the United States, its territories and the District of Columbia in violation of Sections 1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 3). As used herein, the term "PSPs" refers to shelf-stable seafood products (predominantly tuna) that are sold in cans, pouches or ready-to-eat serving packages.

## JURISDICTION AND VENUE

2.    This complaint is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover treble damages, equitable relief, costs of suit, and reasonable attorneys' fees for violation of Section 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3). The Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

3.    Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22), and 28 U.S.C. § 1391(b), (c), and (d) because Defendants reside, transact business, are found within, and/or have agents within this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

4.    This Court has personal jurisdiction over Defendants because, *inter alia,* each: (a) transacted business in this District; (b) directly or indirectly sold and delivered PSPs in this District; (c) has substantial aggregate contacts with this

District; and (d) engaged in an illegal price-fixing conspiracy and agreement to limit capacity that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## PLAINTIFF

5.     Plaintiff Olean Wholesale Grocery Cooperative, Inc. is a current resident of the State of New York.  During the Class Period, Plaintiff directly purchased PSPs from one of more of the Defendants and has suffered pecuniary injury as a result of the antitrust violation alleged herein.

## DEFENDANTS

6.     Defendant Bumble Bee Foods LLC ("Bumble Bee") is a domestic corporation with its principal place of business located at 9855 Granite Ridge Drive, Suite 100, San Diego CA 92123.  Bumble Bee produces and sells PSPs throughout the United States (including this District), its territories and the District of Columbia.  Bumble Bee is privately owned by Lion Capital ("Lion"), based in the United Kingdom.

7.      Defendant Tri-Union Seafoods LLC is a domestic corporation with its principal place of business located at 9855 Granite Ridge Drive, Suite 100, San Diego CA 92123.  Tri-Union Seafoods LLC produces and sells PSPs throughout the United States (including this District), its territories and the District of Columbia.  Unless otherwise indicated, Tri-Union Foods LLC will be referred to herein as "CoS". CoS is owned by Thai Union Frozen Products ("TUF"), a company based in Thailand.

8.     Defendant StarKist Company ("StarKist") is a domestic corporation with its headquarters at 225 North Shore Drive, Suite 400, Pittsburgh PA 15212. StarKist produces and sells PSPs throughout the United States (including this District), its territories and the District of Columbia.  StarKist is privately owned by Dongwon Enterprise ("Dongwon"), based in South Korea.

9.      Defendant Tri Marine International, Inc. ("Tri Marine") is a domestic

corporation with its principal place of business located at 10500 N.E. 8th St., Suite 1888, Bellevue, WA 98004. Tri Marine's website states as follows:

> The right combination of fishing fleets, processing plants, and global organization makes Tri Marine a comprehensive and reliable supply partner for tuna and tuna products.
>
> Tri Marine's contract and owned fishing fleets deliver their catch to our processing plants, which are located near the fishing grounds in countries that can export duty free to end markets. With enough capital, technical expertise and experienced management, we make it all work together for the specific benefit of the world's leading tuna brands.

Tri Marine operates a fish processing plant in San Pedro, California and supplies, *inter alia*, processed tuna to its "partners," which include StarKist and CoS, for use in the production of PSPs. Tri Marine also operates a management company called Tri Marine Management Co., LLC and The Tuna Store, LLC to market and sell PSPs.   Tri Marine produces PSPs under its own "Ocean Naturals" label and produces PSPs for Costco under the "Kirkland" brand name. Tri Marine's website describes itself as "a vertically integrated supplier of private label and branded, consumer packaged cans and pouches, and fresh, frozen and Ultra Low Temperature (ULT) seafood products."

## UNNAMED CO-CONSPIRATORS

10.     On information and belief, at all relevant times, other producers of PSPs willingly conspired with Defendants in their unlawful restraint of trade.  All averments herein against Defendants are also averred against these unnamed co-conspirators.

## AGENTS

11.     The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

## INTERSTATE TRADE AND COMMERCE

12.     Throughout the Class Period, there was a continuous and uninterrupted flow of invoices for payment, payments, and other documents essential to the sale of PSPs in interstate commerce between and among offices of Defendants and their customers located throughout the United States, its territories and the District of Columbia.

13.     Throughout the Class Period, Defendants transported substantial amounts of in a continuous and uninterrupted flow of interstate commerce throughout the United States, its territories and the District of Columbia.

14.     Throughout the Class Period, Defendants' unlawful activities, as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial and reasonably foreseeable effect upon commerce in the United States, its territories and the District of Columbia.

## FACTUAL ALLEGATIONS

15.     PSPs are sold to club warehouses, retail groceries, grocery cooperatives, mass merchandisers, and drug stores, among others. According to a May 2012 presentation by Bumble Bee, total United States retail sales of shelf-stable seafood products were $2.346 billion in 2011 and were estimated to be $2.397 billion in 2012.  In one report, Bumble Bee estimated that canned tuna represents 73% of this value. In the same report, Bumble Bee estimated that total United States retail sales of shelf-stable tuna were $1.719 billion in 2011 and were estimated to be $1.750 billion in 2012.

16.     Defendants are the three largest domestic manufacturers of PSPs. The industry is highly concentrated. According to the aforementioned presentation by Bumble Bee, it had 29% of the domestic shelf-stable seafood market, CoS had 18.4% and StarKist had 25.3%. The remaining market share was comprised of smaller companies and private label brands. With respect to shelf-stable tuna, StarKist had 34.6% of the market, Bumble Bee had 27.8% and CoS had 19.4%. In

1    December of 2014, the Wall Street Journal reported that the Defendants' respective
2    shares of the domestic market for canned tuna were 13% for CoS, 25% for Bumble
3    Bee, and 36% for StarKist. Bualuang Securities reported the shares for the domestic
4    canned tuna market slightly differently, with StarKist at 30%, Bumble Bee at 28%
5    and CoS at 20%.

6        17.    This oligopolistic structure within the industry is the result of recent
7    mergers and acquisitions. For example, in 1997, Van Camp Seafood Company
8    ("Van Camp") was acquired by the investment group Tri-Union Seafoods LLC, of
9    which TUF was a member. Thereafter, TUF bought out the other investors to
10   acquire Van Camp completely, which it renamed Chicken of the Sea International,
11   an entity that was later merged into Tri-Union Seafoods LLC. In 2008, Dongwon
12   acquired StarKist from Del Monte Foods for $363 million. Similarly, in 2014, TUF
13   bought King Oscar, a Norwegian sardine canner that sold 37% of its products in the
14   United States. And in December of 2014, TUF announced the acquisition from
15   Lion (subject to regulatory approval) of Bumble Bee for $1.51 billion. The
16   combination of CoS and Bumble Bee would have created a virtual duopoly, with
17   the combined entity substantially exceeding the market share of StarKist. TUF had
18   planned to finance the acquisition partly through a preferential public offering to
19   existing shareholders that would have raised approximately $380 million.

20       18.    On July 23, 2015, TUF suspended the preferential public offering in
21   light of a grand jury investigation commenced by the Antitrust Division of the
22   United States Department of Justice ("DOJ"). TUF disclosed on that day that both
23   Bumble Bee and CoS had received grand jury subpoenas relating to an antitrust
24   investigation of PSPs. The publication Undercurrent News further reported in an
25   article dated that same day that "Thai Union held a conference with analysts on the
26   suspension of the share offer, in which the company's management said other US
27   seafood producers have also received a subpoena requiring the production of
28   relevant information to the DOJ." The publication Global *Competition Review*

similarly reported as follows:

> In a letter to the Bangkok stock exchange on Wednesday, Thai Union chairman Kraisorn Chansiri confirmed that the US Department of Justice is investigating his company's sector, causing Thai Union to suspend a stock issuance that had been intended to finance the $1.5 billion acquisition of Bumble Bee.
>
> He said the Thai Union subsidiary Tri-Union Seafoods, which operates in the US under the Chicken of the Sea brand, had received a subpoena "requiring Tri-Union to provide relevant information to the DoJ in relation to an antitrust investigation of the packaged seafood industry in the United States."

19.     The article goes on to state:

> An industry expert said the subpoena does not appear to be limited to the merger review, and early information indicates the demand for information came from a separate section of the antitrust division, not one tasked with analysing deals.
>
> It is highly likely that something produced in the merger investigation sparked this investigation touching the industry as a whole rather than just the parties to the deal, he said.
>
> ****
>
> The source said others in the industry are now anticipating that they too will be subpoenaed....

20.     Based on these statements, it appears that StarKist received a subpoena as well and that the DOJ's investigation extends to the entire domestic PSP sector.

21.     On October 13, 2015, it was revealed that Tri Marine also received a subpoena in connection with the DOJ's investigation.

22.     The fact that these companies received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's Antitrust Division Manual, available at http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf. Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." Id. at III-82. The staff

request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division." *Id.* "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." Id. at III-83. "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id.*

23. On October 13, 2015, it was further revealed in a news article that

> It is understood that during the course of the DOJ's merger review, evidence of the cartel was uncovered. Chicken of the Sea then sought leniency from the DOJ, which grants full immunity to the first company to come forward and admit to cartel violations.

> It is likely that Chicken of the Sea is seeking so-called "Type B" leniency, in which the DOJ uncovers wrongdoing first and then uses a company's cooperation to build out its case.

24. The significance of CoS seeking Type B leniency is explained on one of the DOJ's webpages (http://www.justice.gov/atr/frequently-asked-questions-regarding-antitrust-divisions-leniency-program):

> **5. Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?**

> Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter. Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.

As indicated on the webpage, the leniency applicant must also establish "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."

25.    Plaintiff, therefore, alleges on information and belief that Tri-Union has confessed its participation in the conspiracy alleged herein and that CoS, Starkist Company and Tri Marine participated in it.

26.    There are economic indications that support the conclusion that there was collusive pricing within the domestic PSP industry.

27.    Consumption of PSPs, particularly canned tuna, has declined over the last ten years in the United States. The annual consumption per person was 3.1 lbs. in 2005, but had fallen to 2.3 lbs. in 2013. This trend has been widely reported.

28.    An article in the *Washington Post* graphically represented this decline by measuring United States annual *per capita* consumption from 1930 to 2010:



The same article presented this graph, showing that while Americans are buying less canned seafood, they are paying more for what they do buy:





29.     Similarly, the National Marine Fisheries Service reported the following consumption trends for canned fish from 1985 to 2013:

**U.S. ANNUAL PER CAPITA CONSUMPTION OF CANNED FISHERY PRODUCTS, 1985-2013**

| Year | Salmon | Sardines | Tuna | Shellfish | Other | Total |
|------|--------|----------|------|-----------|-------|-------|
| 1985 | 0.5 | 0.3 | 3.3 | 0.5 | 0.4 | 5.0 |
| 1986 | 0.5 | 0.3 | 3.6 | 0.5 | 0.5 | 5.4 |
| 1987 | 0.4 | 0.3 | 3.5 | 0.5 | 0.5 | 5.2 |
| 1988 | 0.3 | 0.3 | 3.6 | 0.4 | 0.3 | 4.9 |
| 1989 | 0.3 | 0.3 | 3.9 | 0.4 | 0.2 | 5.1 |
| 1990 | 0.4 | 0.3 | 3.7 | 0.3 | 0.4 | 5.1 |
| 1991 | 0.5 | 0.2 | 3.6 | 0.4 | 0.2 | 4.9 |
| 1992 | 0.5 | 0.2 | 3.5 | 0.3 | 0.1 | 4.6 |
| 1993 | 0.4 | 0.2 | 3.5 | 0.3 | 0.1 | 4.5 |
| 1994 | 0.4 | 0.2 | 3.3 | 0.3 | 0.3 | 4.5 |
| 1995 | 0.5 | 0.2 | 3.4 | 0.3 | 0.3 | 4.7 |
| 1996 | 0.5 | 0.2 | 3.2 | 0.3 | 0.3 | 4.5 |
| 1997 | 0.4 | 0.2 | 3.1 | 0.3 | 0.4 | 4.4 |
| 1998 | 0.3 | 0.2 | 3.4 | 0.3 | 0.2 | 4.4 |
| 1999 | 0.3 | 0.2 | 3.5 | 0.4 | 0.3 | 4.7 |
| 2000 | 0.3 | 0.2 | 3.5 | 0.3 | 0.4 | 4.7 |
| 2001 | 0.4 | 0.2 | 2.9 | 0.3 | 0.4 | 4.2 |
| 2002 | 0.5 | 0.1 | 3.1 | 0.3 | 0.3 | 4.3 |
| 2003 | 0.4 | 0.1 | 3.4 | 0.4 | 0.3 | 4.6 |
| 2004 | 0.3 | 0.1 | 3.3 | 0.4 | 0.4 | 4.5 |
| 2005 | 0.4 | 0.1 | 3.1 | 0.4 | 0.3 | 4.3 |
| 2006 | 0.2 | 0.2 | 2.9 | 0.4 | 0.2 | 3.9 |
| 2007 | 0.3 | 0.2 | 2.7 | 0.4 | 0.3 | 3.9 |
| 2008 | 0.1 | 0.2 | 2.8 | 0.4 | 0.4 | 3.9 |
| 2009 | 0.2 | 0.2 | 2.5 | 0.4 | 0.4 | 3.7 |
| 2010 | 0.2 | 0.2 | 2.7 | 0.4 | 0.4 | 3.9 |
| 2011 | 0.2 | 0.2 | 2.6 | 0.4 | 0.4 | 3.8 |
| 2012 | 0.2 | 0.2 | 2.4 | 0.4 | 0.4 | 3.6 |
| 2013 | 0.4 | 0.2 | 2.3 | 0.4 | 0.4 | 3.7 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

30.     Given this decline in consumption of the signature PSPs, one would expect rational businesses to reduce the prices for PSPs, but that did not happen. The following chart, taken from data available at the Bureau of Labor Statistics, depicts seasonally adjusted U.S. city average prices for shelf stable fish and seafood from January 2005 through the first part of 2015, with the period 1982-84 used as a baseline.



31.     One method by which the Defendants collusively raised prices was by decreasing the size of cans of tuna without also decreasing prices. Beginning in August of 2008, Bumble Bee, CoS and StarKist began distributing 5 oz. cans of tuna to replace their 6 oz. cans. The can size change was largely completed in January of 2009 and is reflected in the steep climb of prices depicted on the foregoing chart. This was portrayed as a response to rising prices, but it could only have been achieved if Bumble Bee, CoS, and StarKist all agreed to it beforehand.

32.     Even with this alteration in can size for processed tuna, the Defendants were still unhappy with the prices they obtained. Chris Lischewski, Bumble Bee's President and CEO, publicly complained that canned tuna was "too cheap."

33.     Bumble Bee, CoS and StarKist jointly sponsored the "Tuna the Wonderfish" advertising campaign of 2011-12 to remedy this issue. This campaign was bankrolled by the Defendants and carried out under the auspices of the National Fisheries Institute's Tuna Council ("Tuna Council") with the support of Thai processors. In it, the Defendants teamed up for marketing purposes. Joe Tuza, Senior Vice-President of Marketing for StarKist, reportedly said that "[w]e worked together surprisingly well." He said further that the campaign, intended to increase consumption of tuna, was based on the hope that "as the water level rises…all boats rise with the tide", referring to the three aforementioned companies. The same philosophy appears to undergird the alleged price-fixing conspiracy.

34.     The price increases for shelf stable seafood products in recent years are not explained by increases in raw material costs. While the cost per metric ton of skipjack tuna rose in 2012 and early 2013, it declined precipitously thereafter. According to the April 19, 2015 issue of *Tuna Market Intelligence*, "[a]s recently as June last year, skipjack was selling at US$1,800 in Bangkok. But the price has since plummeted to US$1,000 since the beginning of the year, with industry officials anticipating further reductions in price this year." Tuna exporters in Ecuador noted in January of 2015 that the price per metric ton had declined from $1400 to $800. And the United Nations Food & Agriculture Organization noted in its May 2015 "Food Outlook" biannual report noted that tuna prices had dropped considerably in 2014: "tuna prices declined significantly due to excess supply, with frozen skipjack prices hitting a 6-year low." Despite these drastically declining raw material costs, Defendants did not decrease prices and try to obtain more market share.

35.     TUF's Annual Reports discuss this situation. In its 2013 Annual Report, TUF stated that "our branded tuna business showed resilient growth from 2012 thanks to the price adjustments in Europe and *more rational market competition in the US*." (Emphases added). It said in the same report that its future

profit margins would depend upon "[r]easonable US canned tuna competition

*without unnecessary price*." (Emphases added). In its 2014 Annual Report, TUF

explicitly noted that this goal had been achieved. It stated:

> *Thanks to reduced price competition (absence of cut throat pricing)* and generally lower fish cost, *our own tuna brands marked a great year of increased profitability*. Despite minimal sales growth in the US, competitive inventory cost and reasonable market conditions helped lift the margin of our US brand. (Emphases added).

36.     The same report went on to note that "*sensible market competition*,

supported by lower raw material costs, made it possible for our own tuna brands to

expand their margins through the year despite limited volume growth." (Emphases

added). It indicated that future revenue growth would again be dependent upon

"*[r]easonable US canned tuna market competition that focuses more on*

*consumption creation than market share alone*." (Emphases added).

37.     Similarly, Kelly Mayer, a partner in Lion Capital (the owner of

Bumble Bee) released a memorandum in December of 2014 to limited partners that

stated:

> With respect to earnings development under our ownership, Bumble Bee maintained and grew gross margins *through disciplined pricing actions*, leading to adjusted EBITDA climbing to over $150 million this year, the highest level of EBITDA in the company's history. (Emphases added).

38.     The "reasonable market conditions", "more rational market

competition", "sensible market competition", avoidance of battles for market share,

"absence of cut throat pricing" and pricing "discipline" that the reports and

statements note could only have come about through collusion. It would have been

against the individual self-interest of each Defendant to eschew increasing market

share during this period by lowering prices.

39.     There were numerous business opportunities for Defendants to meet

and engage in such collusion. One such opportunity is provided by the annual

Infofish convention held in Bangkok, Thailand during the Class Period. Another

was provided by the Tuna Council. As explained on that organization's website:

> The National Fisheries Institute's Tuna Council represents the largest processors and household names for canned and pouch tuna in the U.S. including *Bumble Bee®, Chicken of the Sea® and StarKist®*. The Tuna Council speaks for the tuna industry on numerous issues including food safety, labeling, sustainability, nutrition education and product marketing.

40.     Another opportunity to collude was provided through bilateral copacking agreements between Bumble Bee and CoS. Bumble Bee copacks for CoS at the former's plant located in Santa Fe Springs, California with respect to West Coast sales. CoS does the same for Bumble Bee at the former's plant in Georgia with respect to East Coast sales. Thus, even before the proposed merger, these two companies were cooperating closely. These interlocking relationships provided an excellent opportunity to collude on pricing.

41.     Additionally, starting no later than 2011, Jill Irvin of Bumble Bee, Shue Wing Chan of CoS, and In-Soo Choo of StarKist directly communicated with each other and with the United States Food and Drug Administration concerning, among other matters, the standards for calculating the package weight of tuna products.  Collaborations such as this provided opportunities to meet and engage in anticompetitive conduct.

42.     And Tri Marine, which dealt with and/or partnered with Bumble Bee, CoS, and StarKist throughout this period provided an excellent conduit for the exchange of price information. On its website, Tri Marine trumpeted its abilities at "market intelligence", saying that it "maintains commercial relationships with the major decision makers in the tuna industry.  We use our access to industry leaders to understand the dynamics of the tuna market and the changing needs of boat owners, processors and brands." It also trumpeted how it "works closely" with "partners" like CoS and Starkist. Indeed, Renato Curto, President of Tri Marine, has long preached the gospel of "cooperation":

> If we are going to specialize and free ourselves to do what we do best, we are all going to have to cooperate with one another more than we ever have. In fact, I see no other issue as being more immediately important to us here today. Cooperation is vital to our industry.

## CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action on behalf of themselves and as a class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class (the "Class"):

> All persons and entities that directly purchased packaged seafood products within the United States, its territories and the District of Columbia from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time between January 1, 2008 and the present.  Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and immediate families.

44.     Plaintiff does not know the exact number of members of the Class because such information is in the exclusive control of Defendants.  Due to the nature of the trade and commerce involved, however, Plaintiff believes that Class members number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States, its territories and the District of Columbia so that joinder of all Class members is impracticable.

45.     There are questions of law and fact which are common to the claims of Plaintiff and the Class, including, but not limited to:

a.     Whether Defendants engaged in a combination or conspiracy with their co-conspirators to fix, raise, maintain, and/or stabilize the prices for PSPs;

b.     Whether the purpose and/or effect of the acts and omissions alleged herein was to restrain trade, or to affect, fix, control, and/or maintain the prices for PSPs;

c.     The existence and duration of the horizontal agreements alleged herein to fix, raise, maintain, and/or stabilize the prices for PSPs;

d.      Whether Defendants violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

e.      Whether Defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers, employees, or representatives were acting within the scope of their authority and in furtherance of Defendants' business interests;

f.      Whether, and to what extent, the conduct of Defendants caused injury to Plaintiff and members of the Class, and, if so, the appropriate measure of damages; and

g.      Whether Plaintiff and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of Sections 1 and 3 of the Sherman Act.

46.    Plaintiff's claims are typical of the claims of the members of the Class.

47.    Plaintiff will fairly and adequately assert and protect the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class.

48.    Plaintiff is represented by counsel competent and experience in the prosecution of antitrust and class action litigation.

49.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

50.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

a.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

b.      The Class is readily definable and one for which records should exist in the files of Defendants.

1      c.      Prosecution as a class action will eliminate the possibility of

2   repetitious litigation.

3      d.      Treatment as a class action will permit a large number of

4   similarly situated persons to adjudicate their common claims in a single forum

5   simultaneously, efficiently, and without the duplication of effort and expense that

6   numerous individual actions would require.

7      e.      Class treatment will permit the adjudication of relatively small

8   claims by many Class members who otherwise could not afford to litigate an

9   antitrust claim such as is asserted in this complaint on an individual basis.

10      51.      This class action presents no difficulties of management that would

11   preclude its maintenance as a class action.

12   <u>**TOLLING OF THE STATUTE OF LIMITATIONS**</u>

13      52.      Plaintiff had neither actual nor constructive knowledge of the facts

14   constituting its claim for relief.

15      53.      Plaintiff and members of the Class did not discover, and could not

16   have discovered through the exercise of reasonable diligence, the existence of the

17   conspiracy alleged herein until at least July of 2015.

18      54.      Defendants engaged in a secret conspiracy that did not reveal facts that

19   would put Plaintiff or the Class on inquiry notice that there was a conspiracy to fix

20   prices for PSPs.  Accordingly, Plaintiff could not have had either actual or

21   constructive knowledge of the price fixing scheme until the public disclosure of the

22   DOJ's criminal investigation.

23      55.      On August 25, 2015, Plaintiff, through its counsel, wrote to Bumble

24   Bee, CoS, and StarKist, through their counsel, requesting information on whether

25   each was the DOJ's amnesty applicant.  Plaintiff further asked for detailed

26   information concerning these Defendants' knowledge of the time frame of the

27   conspiracy, the participants in the conspiracy, the mechanisms used to enforce the

28   conspiracy, the identity of the witnesses with knowledge of the conspiracy, and the

location of documents that evidence the existence of the conspiracy.  Bumble Bee, CoS, and StarKist refused to respond by September 15, 2015, as requested by Plaintiff, and to this date continue to refuse to respond.

56.    On October 13, 2015, Plaintiff, through its counsel, wrote a further letter to CoS's counsel noting that CoS had not responded to its letter of August 25, 2015 and that Plaintiff now understood that CoS was the "Type B" leniency applicant to the DOJ.  Plaintiff invited CoS to respond to Plaintiff's request for cooperation.  As of the filing of this amended complaint, CoS has not responded.

57.    On October 14, 2015, Plaintiff, through its counsel, wrote a letter to Tri Marine requesting its cooperation and sought the same type of information described above with respect to the August 25, 2015 letters sent to Bumble Bee, CoS, and StarKist.  As of the filing of this amended complaint, Tri Marine has not responded.

58.    Because Defendants' agreement, understanding and conspiracy was kept secret, Plaintiff and members of the Class were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for PSPs during the Class Period.

59.    Defendants actively misled the public about the price-fixing scheme. For example, Defendants issued false and misleading announcements concerning the reasons for their price increases, none of which disclosed that the Defendants had agreed amongst themselves to fix and raise the price of PSPs.  When a party speaks on a subject matter, it must speak the whole truth.

60.    No Defendant has yet publicly disclosed its participation in an agreement among themselves to fix and/or raise the price of PSPs.

## COUNT I

**Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)**

61.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

62.    Defendants and their co-conspirators engaged in a continuing contract, combination, and conspiracy to artificially fix, raise, maintain, and/or stabilize the prices of PSPs within the United States, its territories, and the District of Columbia in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

63.    Defendants and their co-conspirators agreed to, and did in fact, restrain trade or commerce by fixing, raising, maintaining, and/or stabilizing at artificial and non-competitive levels, the prices of such PSPs.

64.    In formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize the price of PSPs.

65.    The illegal combination and conspiracy alleged herein had the following effects, among others:

a.    The prices charged by Defendants to, and paid by, Plaintiff and members of the Class for PSPs were fixed, raised, maintained and/or stabilized at artificially high and non-competitive levels;

b.    Plaintiff and members of the Class have been deprived of free and open competition in the purchase of PSPs;

c.    Plaintiff and members of the Class have been required to pay more for PSPs than they would have paid in a competitive marketplace absent Defendants' price-fixing conspiracy;

d.    Competition in the sale of PSPs has been restrained, suppressed or eliminated.

66.    As a direct and proximate result of Defendants' conduct, Plaintiff and members of the Class have been injured and damaged in their business and property in an amount to be determined according to proof.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays:

1        A.     That the Court determine that this action may be maintained as a class

2    action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and

3    direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the

4    Federal Rules of Civil Procedure, be give to members of the Class;

5        B.     That the Court adjudge and decree that the contract, combination and

6    conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of

7    Section 1 of the Sherman Act;

8        C.     That the Court enter judgment against Defendants, jointly and

9    severally, in favor of Plaintiff and the Class;

10       D.     That the Court award Plaintiff and the Class treble damages;

11       E.     That the Court award Plaintiff and the Class attorneys' fees and costs

12   as well as pre-judgment and post-judgment interest as permitted by law;

13       F.     That Defendants and their co-conspirators, their respective successors,

14   assigns, parents, subsidiaries, affiliates and transferees, and their respective officers,

15   directors, agents and employees, and all other persons acting or claiming to act on

16   behalf of Defendants or their co-conspirators, or in concert with them, be

17   permanently enjoined and restrained from, in any manner, directly or indirectly,

18   continuing, maintaining or renewing the combination, conspiracy, agreement,

19   understanding or concert of action, or adopting any practice, plan, program or

20   design having a similar purpose or affect in restraining competition; and

21       G.     That the Court award Plaintiff and the Class such other and further

22   relief as may be deemed necessary and appropriate.

24   Dated: October 15, 2015                Respectfully submitted,

26                       By:  */s/ Bonny E. Sweeney*
                    Michael P. Lehmann (Cal. Bar No. 77152)

27                       Bonny E. Sweeney (Cal. Bar No. 176174)
                    Christopher L. Lebsock (Cal. Bar No.
                    184546)

28                       HAUSFELD LLP

600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel:   (415) 633-1908
Fax:  (415) 358-4980
Email:  mlehmann@hausfeld.com
Email:  bsweeney@hausfeld.com
Email:  clebsock@hausfeld.com

Michael D. Hausfeld
James Pizzirusso
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email:   mhausfeld@hausfeld.com
Email:   jpizzirusso@hausfeld.com

Arthur Bailey
Rupp Baase Pfalzgraf Cunningham LLC
1600 Liberty Building
424 Main Street
Buffalo, New York 14202
Jamestown, NY 14701
Telephone: (716) 854-3400
Facsimile: (716) 332-0336
Email: bailey@ruppbaase.com

*Counsel for Plaintiff and Interim Lead
Counsel for the Direct Purchaser Class*